**GELB v. MINNEFORD YACHT YARD, Inc.**

**THE EDWARD JAMES.**

United States District Court,
S. D. New York.

Oct. 29, 1952.

212

Purdy, Lamb & Catoggio, New York City, for libellant. Vincent A. Catoggio, New York City, of counsel.

Macklin, Speer, Hanan & McKernan, New York City, for respondent. Leo F. Hanan, New York City, of counsel.

SUGARMAN, District Judge.

On September 28, 1945, the libellant Gelb, owner of the gasoline yacht "Edward James", brought her off the respondent's yard at City Island, New York. The yard and waters fronting it are unprotected to the northeast. Gelb informed respondent's yard manager Gauss of his intention, if he did not sell the yacht, to lay her up at respondent's yard for the winter. It was arranged that Gelb would advise Gauss if and when respondent should haul the "Edward James" ashore. Gauss cautioned Gelb not to unduly delay because, if and when such order was given, the work would have to await its turn as against other of respondent's commitments to haul and store vessels.

Gauss and libellant's captain moored the "Edward James", with the vessel's lines, fore and aft to two dolphins designated by Gauss, about one hundred twenty-five feet offshore from the end of the respondent's dock. After removing some personal effects from the yacht, Gelb turned the keys over to Gauss.

On October 6, 1945, Gelb delivered a certified check to the Secretary of War as a deposit on a bid then being made by him for the purchase of another vessel from the United States. On October 10, 1945, the vessel upon which Gelb had bid was sold to a higher bidder, of which Gelb was shortly thereafter apprised, and the United States later returned Gelb's certified check, which he deposited in his account on November 14, 1945.

Gelb, although he had registered the "Edward James" with the Bureau of Cus-

toms of the Treasury Department on September 16, 1943 and continuously thereafter as "employed in carrying on the mackerel fishery", never used the vessel for that or any other commercial purpose and maintained it solely for pleasure. Gelb's admission that he maintained a boat only for pleasure, when taken with the coincidence of his pending bid and his bringing the yacht to respondent's yard, lends credence to Gauss' testimony that Gelb intended to sell the "Edward James"; for that reason kept her afloat; took Gauss for "a spin" in the hope that Gauss might produce a purchaser; and instructed Gauss to defer hauling the "Edward James" ashore until further orders were forthcoming from Gelb.

After Gelb failed to procure the other vessel and on November 20, 1945 he telephoned Gauss and instructed him to haul the "Edward James" ashore. Gauss agreed to do so on condition that the work be delayed until respondent had serviced other vessels for which arrangements for haulage and storage had been made prior to November 20, 1945.

Some time between September 28, 1945 and November 28, 1945 additional lines, supplied by the respondent were added to those of the vessel in securing her to the dolphins and she may have been pumped out by respondent's employees but no charge was made for these services.

From November 20 to November 28, 1945, the respondent was fully engaged in hauling and attending other vessels for which prior commitments had been made, except on Thanksgiving, Saturday and Sunday when there was no work at its yard.

On the evening of November 28, 1945, at approximately 6:30 P.M., Gauss left the respondent's yard in charge of a watchman. A sharp breeze was blowing at that time. The yard had received no notice that day from the Army, Navy or Coast Guard (as was usually given to yards handling government vessels, when necessary) to expect any unusual weather. At about midnight, Gauss was awakened by the sound of a heavy wind and went to the yard. He went on the dock and examined a half dozen or so vessels tied up at the dock proper. He also looked out at the "Edward James" and found her apparently securely tied to the dolphins and satisfactorily riding the storm which had then arisen. An army barge, which had been anchored near the "Edward James", also appeared to him to be safely moored. He left the yard at about 2:00 A.M. The next morning the "Edward James" was found to have sunk from some unknown cause. When she was ultimately raised in January of 1946, she was found to be a total wreck.

Although, at 5:30 P.M. on November 28th the Weather Bureau predicted northeast winds of velocity increasing to occasional gusts of seventy miles per hour by late that night, and ordered storm warnings from Eastport, Maine, to Block Island, Rhode Island, the New York Station recorded the maximum wind velocity to have been twenty-nine miles per hour at 1:58 A.M. on November 29, 1945 and twenty-five miles per hour at 2:52 on that morning. Otherwise, the wind velocity did not exceed twenty-three miles per hour for the period commencing at noon on November 28th and terminating at noon on November 29, 1945.

The libellant commenced this suit by filing his libel on September 28, 1948, almost three years after the event. The respondent pleads laches as a defense. The files of this court show that on April 5, 1946, within five months after the loss of the "Edward James", libellant Gelb, as plaintiff, commenced an action at law in the New York Supreme Court against his insurer. The State Court removed that action to this court. It was tried to a jury resulting in a defendant's verdict. Gelb appealed. The Court of Appeals affirmed Gelb v. Automobile Ins. Co., 2 Cir., 168 F.2d 774, and its judgment of affirmance became the judgment of this court on July 21, 1948. Accordingly, when libellant commenced this suit on September 28, 1948, he acted with reasonable promptness. The respondent's motion to dismiss for laches is denied inasmuch as libellant has adequately explained the delay and respondent has failed to estab-

lish that it has suffered any prejudice thereby.

 The gravamen of the libel herein is negligence. It is a

"familiar rule in the law of bailments that a prima facie presumption of negligence on the part of the bailee arises from the bailor's proof that the bailed article was delivered in good condition and was returned damaged, or not returned at all. * * * The presumption does not * * * cast upon the bailee the ultimate burden of proving how the damage occurred. * * * It is a rebuttable presumption whose sole effect is to shift to the bailee the burden of proceeding with the evidence. * * * There are, in general, two ways in which the bailee may rebut the presumption. He may show either how the disaster in fact occurred and that this was in no way attributable to his negligence, or that he exercised the requisite care in all that he did with respect to the bailed article so that, regardless of how the accident in fact transpired, it could not have been caused by any negligence on his part. * * * The presumption * * * once rebutted in either of these fashions, disappears from the case. * * * It is thus solely a procedural device and does not in any way affect the ultimate burden of proving the bailee's negligence, which burden remains throughout with the plaintiff-bailor. * * * " Richmond Sand & Gravel Corp. v. Tidewater Const. Corporation, 4 Cir., 170 F.2d 392, 393.

 Sufficient is shown in the respondent's proof herein to overcome the presumption of negligence that arises from its failure to return the "Edward James". Gauss' warning to Gelb on September 28, 1945 not to unduly delay the order to haul the "Edward James" ashore; the placing by the respondent of additional lines securing the "Edward James" to the dolphins while the vessel was moored off the respondent's yard; the probable pumping out of the "Edward James" during that period; Gauss' acceptance of the order to haul the "Edward James" ashore on No-

vember 20, 1945, subject to prior commitments to service other vessels; Gauss' having gone to the yard on the night of the storm and having viewed the "Edward James" and found her riding the storm satisfactorily; all add up to the exercise by the respondent of the requisite care of the "Edward James" so that regardless of what caused her to sink, the presumption of respondent's negligence was overcome.

 The presumption thus eliminated, it became incumbent upon the libellant to establish in fact negligence on the respondent's part. This libellant attempts by asserting that the order to haul the "Edward James" ashore was given as soon as she arrived at the yard and respondent nevertheless kept her tied up for an unreasonable period. However, I have found that the order was not given until November 20, 1945 and on that finding the fact that she was tied up as aforesaid from September 28 until November 20, 1945 is immaterial.

The libellant next urges that it was negligent for the respondent to have caused the army barge to be moored close by the "Edward James" thus creating a hazard not otherwise present. The invalidity of this assertion is its assumption that the proximity of the barge had something to do with the sinking of the "Edward James". It is the sheerest of speculation that the "Edward James" broke her lines and was pounded to death against the barge. Although Gauss admitted that the "Edward James" might have met her doom in this fashion, there is no proof that the sinking was thus caused and in fact, no one now knows how or why she went down.

The libellant next urges that the weather on November 28th should have put the respondent on notice to move the "Edward James" to a safer berth. While it is true that storm warnings were directed from Eastport to Block Island, there remains uncontradicted Gauss' testimony that the City Island boating community accepted these predictions, affecting as they do, an exposed area of from one hundred to four hundred miles distant, as merely an indication that some foul weather might be expected at City Island at a later time.

Sustenance thereto is found in the report of the New York Station of the Weather Bureau that at no time during the period involved did the wind in this vicinity attain a velocity greater than twenty-nine miles per hour, and that only momentarily.

The libellant next urges that when Gauss came to the yard that night, he did nothing to protect the "Edward James". I accept Gauss' testimony that he viewed the "Edward James" that night and found her riding the storm satisfactorily; that he did not deem it necessary to do anything about her position; that she was in a safer berth than the boats tied up at the dock which were in constant danger of damage by being blown against each other; that even if the "Edward James", at that late hour at night, had shown signs of being in danger, it would have been utter recklessness for Gauss or the watchman to have risked their lives by attempting to put out to her in a small boat or dory in the storm that had blown up late that night.

Finally, libellant argues that the respondent was negligent in not having hauled the "Edward James" ashore between the 20th of November when the court finds the order was given, and November 28th, when the vessel sank. On the findings that Gauss cautioned Gelb on September 28, 1945, not to unduly delay the order to haul the vessel ashore; that, having accepted the commission on November 20, 1945, it was subject to prior existing orders, and that, in the interval between November 20th and November 28, 1945, (holidays excluded) the respondent was fully engaged in executing these prior commitments, no negligence can be ascribed to the respondent for not hauling the vessel ashore in the nine day interval.

Viewing the entire record, the libellant has failed to sustain the burden of establishing as the proximate cause of his loss that the respondent acted other than or failed to act as a reasonably prudent person would have done under similar circumstances and conditions.

There will accordingly be a decree for the respondent. Settle findings of fact and conclusions of law.