Marshall H. WENTZ and City Express, Inc., to their own use and to the use of the Home Fire and Marine Insurance Company of California, Atlantic Marine Department, a body corporate

v.

Robert W. HARTGE and Grace Hartge, his wife, t/a Hartge's Boat Works.

No. 3674.

United States District Court
D. Maryland, Admiralty Division.
June 24, 1955.

Sol. C. Berenholtz, Sol. Kaplan, Preston A. Pairo, A. B. Makover, Baltimore, Md., for libellants.

Edwin J. Wolf, Niles, Barton, Yost & Dankmeyer, Baltimore, for respondents.

CHESNUT, District Judge.

The object of this suit in admiralty is to obtain damages for the sinking of a cabin cruiser. The plaintiff, Marshall H. Wentz, was the owner of the boat Almar, which, off and on prior to its sinking on February 19, 1952, had been customarily docked at the boatyard of the defendant, Robert W. Hartge. The contention of the libellant is that he as the owner of the boat was the bailor and Hartge, as proprietor of the boatyard, was the bailee, and that the sinking of the boat was due to the negligence of Hartge. The testimony of numerous witnesses has been heard in open court and while the testimony in respect to many details is quite contradictory, I make the following findings of fact by what I consider the preponderance of evidence in the case.

1. The "Almar" was a cabin cruiser of about 44 foot length, 13 foot beam and 5½ foot depth. Its gross tonnage was 24, net 16. Its motive power was two 150 horsepower Packard engines. The hull of the boat was built by Hartge for Wentz in 1948. After it had been built, the Packard engines were installed by another contractor. Still later, in 1950, Wentz had further equipment put in consisting of Maxim Silencers. The exhaust pipes led from the Silencers to the rear and opened through the stern of the boat, called the transom, at a height of about one inch from the level of the water as the boat normally floated. The nature and shape of the hull was of a so-called "chine" construction, the purpose and tendency of which is to somewhat depress the bow of the boat in navigation and thus to avoid the lifting of the bow common in speed boats and thus secure a more stable position of the boat in the water.

2. Hartge's boatyard is at Eastport, near Annapolis, Maryland. The boat was moored there during the winter of 1949–50; in the winter of 1950–51 it was in Florida; but for the winter of 1951–52 it was again moored with Hartge. The boatyard charged an annual fee of $100 to the owner for the privilege of mooring the boat during the year. The customary relations between the parties was that included in the service charge, in addition to the privilege of occupying the same mooring space (5th from the end of the pier) the boatyard furnished to the owner fresh water and also electric power from the Yard and customarily from time to time inspected the boat as it floated at the mooring, and if any threatened peril was apparent, necessary attention would be given.

3. The "winterizing" of the boat, that is, putting it in condition for mooring for the winter at the boatyard, was customarily performed by the owner and

was so performed by him in November 1951. The winterizing ordinarily consists of making the boat staunch and tight for the winter season. It naturally implies the closing of seacocks on the boat where necessary and in this case included the removal of the storage batteries from the boat. It also generally includes the removal from the boat of various parts of interior equipment such as bedding, clothing and other articles subject to deterioration from long winter storage. Winterizing of the boat is a single act to be performed by the owner without participation from the boatyard unless there is a special agreement to the contrary. The winterizing of the boat in November 1951 was done by the owner or his employees. I find from the weight of the credible evidence, which I have heard and considered that the winterizing of the boat in the fall of 1951 was not well and completely done.

4. The boat had a three-inch painted red water line to indicate the safety or otherwise of the boat as she floated in the water. The customary practice at the boatyard was to daily, or more frequently if necessary, inspect all boats moored at the boatyard which in all were 30 or more during the 1951–52 season. This duty was regularly performed by Hartge or his employees and particularly I find from the testimony that the boat was inspected at 9:30 P. M., and again at 12 midnight by, in the first case an employee of Hartge, and the later time by Hartge himself, on the night before she sank. At those times it was found that the boat was floating in apparent good condition with no indication that the water was above the water line or that there was then any need to pump water out of the boat. The winterizing of the boat included battening down or covering with canvas the cabin which was locked. There were hatches on the boat which, on opening and inspection from time to time, would have shown the amount of water then in the boat, but all these hatches except possibly one were accessible only through the locked covered cabin. So long as the water did not advance over the water line the inspection revealed no need for pumping the boat. In January 1952, about a month before the boat sank, Wentz, before leaving for Florida, visited the boat moored at the dock, and finding on inspection of the hatches that there seemed to be an accumulation of water in the bilges, asked Hartge to pump the boat and gave him the key to give him access to the cabin. Hartge promised to do that and testified directly without contradiction that he had done so the next day.

5. I find the cause of the sinking of the boat was the fact that in winterizing the boat the drain plugs at the bottom of the Maxim Silencers had been removed by the owner or his employees. The Silencers consist of two cylinder-like structures near the stern of the boat connected with the engine containing baffles and water for the purpose of somewhat deadening the noise of the exhaust from the engine. From the Maxim Silencers the exhaust pipes, about three inches in diameter, lead to and through the stern of the boat, called the transom; and as the boat floats these openings were about one inch above water. Small boats of this general type vary in their construction and I find from the evidence that there is no definite and certain custom requiring the fitting of wooden plugs into the ends of the exhaust pipes. In the instant case the safety of the boat would not have required the insertion of wooden plugs in the exhaust pipes had not the drain plugs been removed from the Maxim Silencers. The undulations of the boat as she floated and as affected by wind and weather and tide and the intermittent lapping of water into the exhaust pipes, obviously permitted some water to flow into the exhaust pipes, and through the Silencers into the bilge. Although the boat had been inspected and found in good condition with respect to the water line as she floated both at 9:30 P. M., and at 12 midnight the prior night, the boat was

found to be in a sinking condition with water within 18 inches of her deck at 6:30 the next morning by an oyster boat going out into the Bay. This was reported to Hartge who immediately gave what attention could be given but it was then impossible to prevent the sinking of the boat. The sinking was promptly reported by Hartge to the Baltimore office of the owner who in turn notified the insurer who instructed Mr. Mitchell, an experienced marine surveyor, to look into and report on the conditions. He authorized Hartge to have the boat raised at a cost of not more than $500. Hartge did have it raised and the boat was then towed to the nearby boatyard of one Petrini who also testified at length as a witness with regard to the boat's condition on inspection after it had been hauled onto his marine railway. Mitchell's report accepted as the cause of the sinking the accumulation of water through the unblocked exhaust pipes in conjunction with the removal of the drain plugs from the Silencers.

6. I find that the cause of the sinking of the boat was that it had not been properly winterized by the owner when in November 1951 it was left in the custody of Hartge on the usual terms and conditions. The particular defect or omission in the proper winterizing was (1) the removal of the drain plugs from the Maxim Silencers and (2) failure to fit wooden plugs into the exhaust pipes. If the drain plugs had not been removed by the agent of the owner from the Silencers or if wooden plugs had been inserted into the exhaust pipes at or near the water level, the boat would not have sunk, so far as the evidence in this case goes. Hartge had nothing to do with the removal of the drain plugs from the Silencers and did not even know that they had been so removed. As to the failure to put wooden plugs in the mouth of the exhaust pipes there is contradiction in the oral evidence of Hartge and Maddox, Wentz' employee. Wentz said he told Maddox to insert the plugs and Maddox says he asked Hartge to do so and that Hartge promised to do so. Hartge denies

that he was ever asked by Maddox to insert the plugs. Wentz contends that Hartge should have noticed the absence of the plugs in the exhaust pipes; Hartge's statement is that the absence of the plugs in the exhaust pipes was not something from which he would anticipate danger to the boat, because some boat owners insert them and some do not. Even if Hartge had noticed the absence of the plugs, which he says he did not notice, that would of itself have been no reason to suspect danger to the boat if the plugs in the Silencers had not been removed, of which fact Hartge had no knowledge. There is also a controversy between witnesses with respect to the appearance of rags stuffed in the exhaust pipes on one or more occasions during the winter and before the sinking of the boat. Wentz said that he saw such rags there in January 1952 when he visited the boat but did not mention the matter to Hartge because he, Wentz, did not know but that the wooden plugs might also have been inserted. Hartge denies ever noticing rags in the exhaust pipes and there is affirmative evidence that the rags that were there after the boat had been raised, were put there during the raising of the boat by an employee of Hartge who, on going into the hold discovered that water continued to flow in through the exhaust pipes; and, with respect to the presence or absence of the rags, I accept as more satisfactory the respondent's testimony on that point.

7. Counsel for the libellant contends that if the boat was floating properly with respect to the water line at 12 o'clock midnight, no sufficient amount of water could have accumulated through the exhaust pipes and into the bilge to cause the boat to sink at 6:30 or 7 o'clock the next morning, as the weather charts did not show any unusual high winds or other bad weather conditions that night although there had been high winds the night before. Therefore it is argued that there was no actual or proper inspection of the boat that night. I do not accept this argument as sound. I have found that the inspection was duly made and

that the water at the time was not above the red water line. There was also expert evidence given by a qualified naval architect to the effect that although the water was not above the red line when the last inspection was made, further accumulation of water in the bilges through the open exhaust pipes and Silencers could within a comparatively few hours have caused water surrounding the hull to reach one or more open or unprotected ports in the hull very close to the water line and thereby permit a much larger volume of water to rapidly flow through these ports into the hull of the boat, thus causing her to sink. In this connection Petrini testified that upon his examination of the hull at his shipyard he found an opening in the hull at or very near the red water line. This open port consisted of an exhaust pipe leading from an auxiliary engine supplying power to a generator. This exhaust pipe was itself in bad condition owing to the corrosive effect of escaping hot gas fumes. Petrini also noted that some of the seacocks controlling other ports had not been properly closed and that some of the ports were not properly equipped with seacocks. The naval architect, Meese, also referred to the possibility that the port leading from the boat's toilet to the outside hull if not securely closed by proper seacocks could well have permitted a large inrush of water as soon as the boat had settled sufficiently for the outside water to reach these ports.

Meese, the architect, explained his testimony by charts showing the inside dimensions of the boat with detailed computation of the quantities of water in the bilges sufficient respectively to cause the boat to sink to different levels, indicated on the chart.

Counsel for the libellant objected to this expert testimony particularly on the ground that some of the quantitative calculations were based on assumption of fact not clearly or sufficiently proven by other evidence. In reaching my conclusion in this case, I have not found it necessary to rely on the accuracy of the calculations made by Meese and have accepted his evidence only to the effect that it tends to show how after the boat had once sunk to slightly above the water line it could have been caused thereafter to sink by water flowing into the hull through nearby open ports in much greater volume than had previously accrued through gradual accumulation of water through the exhaust pipes and Maxim Silencers, sufficient in amount to lower the boat in the water to and shortly above the red water line.

The law applicable to the case is not in dispute. It is well settled by two recent decisions of the Court of Appeals of this Fourth Circuit and by other judicial decisions. The opinions in the recent cases in this Circuit were both written by Judge Dobie who is particularly expert as to the subject matter. See Dobie on Bailments. Orrell v. Wilmington Iron Works, 1950, 185 F.2d 181; Richmond Sand & Gravel Corp. v. Tidewater Construction Corp., 1948, 170 F.2d 392, both in this Circuit. Another case in the Fifth Circuit is also in point as to the applicable law, Stegemann v. Miami Beach Boat Slips, Inc., 1954, 213 F.2d 561. Another case of the same nature involving a factual situation not greatly dissimilar to the present case, and where the boatyard was held not liable, is Gelb v. Minneford Yacht Yard, D.C.S.D.N.Y., 108 F.Supp. 211.

■ The law of bailment, so far as applicable to this case, may be briefly summarized by saying that, when the bailor delivers to the bailee an article *in good condition* and receives it back in damaged condition, that casts upon the bailee the duty to go forward with the evidence in explanation of the damaged condition. The bailee may then show either (1) how the accident happened and that it could not have been prevented by the exercise of due diligence on his part, or (2) if the cause of the damage is not shown, nevertheless the bailee has not been guilty of any negligence. After all the evidence is in, the burden of proof or of persuasion remains in the bailor to

show by a preponderance of the evidence that the damage was caused by the negligence of the bailee.

█ In the instant case the testimony of the plaintiff who was the only witness for himself in chief, tended to show that the boat was delivered to the bailee in good condition; but the evidence offered by the respondent shows, as I find, that there was a latent defect in the boat's construction, not known to the bailee and not discernible by him from appearance, in that the drainage plugs had been removed from the Silencers, with the concurrence of failure to place wooden plugs in the exterior of the exhaust pipes. The absence of the wooden plugs was not notice to the bailee of the hidden danger because there was no general custom for all boats to have such plugs. Of the many boats in his custody the majority did not have such plugs in the exhaust pipes. Nor would the "Almar" have needed wooden plugs in her exhaust pipes if the drain plugs in the Silencers had not been removed by the owner in his winterizing of his boat.

██ Counsel for the libellant contends that there was negligence of the bailee in not inspecting the boat from time to time to see if an undue amount of water was accumulating in the bilges; and that there was an affirmative duty on the bailee to make this inspection from time to time and to pump the boat when necessary. The existence of this requirement must be found, if at all, in either the customs of the business or in some special promise by the bailee. While the bailee concedes, of course, that his proper care and custody of the boat requires him to do everything reasonably possible to prevent her from sinking when her floating condition gives indication of necessary pumping, I do not find from the evidence that there exists by custom the obligation on the boatyard to open hatches and determine the quantity of water in the bilges when there is no exterior evidence of excessive water accumulation in the boat. The evidence in this case as to the customs of the business was not very fully developed by either side but the evidence offered on behalf of the boatyard satisfies me by a preponderance of the evidence that the boatyard does not have the duty of interior inspection of the hold unless and until there is some exterior indication of necessity therefor.

█ I find no sufficient evidence in the case that there was a particular promise or agreement by the bailee to pump the boat from time to time. In January 1952 the owner did notice what he thought was an undue accumulation of water in the bilges and asked the bailee to pump the boat and to "keep an eye on it". The uncontradicted testimony of Hartge is that he did pump the boat the next morning and that he did keep an eye on it from time to time by customary daily inspection of the water line.

█ On the evidence as a whole I find and conclude that the libellant in this case has failed to show by a preponderance of the evidence that the bailee was guilty of negligence causing the loss and it results that the libel must be dismissed with taxable court costs allowed to the respondent.

Mrs. Hartge, the wife of the proprietor, was joined as an individually liable respondent on the theory that she was a partner with her husband in the conduct of the business, but there was a failure of proof by the libellant on that point and it was properly abandoned by his counsel.

There was no evidence offered as to the exact amount of the damage and it was agreed at the outset of the trial that the question of liability should be determined before evidence should be offered as to the exact amount of the damage. I therefore make no finding on the latter point. Hartge's bill for the raising of the boat in an amount less than $400, was paid in July 1952 by or for the plaintiff, but with a notation that it was without prejudice to his right thereafter to institute suit to recover damages which he claimed in the amount of about $6,000. The suit was thereafter filed in June 1954.

It is therefore ordered this 24th day of June, 1955 by the United States District Court for the District of Maryland that the libel be and it is hereby dismissed with taxable court costs allowed to the respondent.